# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

United States of America

v.

Margaret Luthra
a/k/a Rita Luthra,

Defendant.
_____

**CRIMINAL NO. 15-CR-30032-MGM**

## RITA LUTHRA, M.D.'S MEMORANDUM OF LAW
## IN SUPPORT OF HER MOTION TO DISMISS THE INDICTMENT

### Introduction

This case brings three criminal charges against Rita Luthra, M.D., all related to a contract (the "Master Speaker Services Agreement") that she, and thousands of other American physicians, entered into with the Warner Chilcott Pharmaceuticals company.  Of the thousands of American physicians who entered into that contract with Warner Chilcott, **only one** is being prosecuted – Dr. Luthra.

Dr. Luthra is a board-certified gynecologist and obstetrician.  Starting in the 2003-to-2004 time frame, she shifted her practice from a mix of obstetrics and gynecology to one solely focused on gynecological care.  Because she was always willing to see Medicaid patients, by 2010 approximately 80% of her patients were Hispanic women from the North End of Springfield, many of whom presented with multiple physical and social pathologies.  *See* Affidavit of Rita Luthra, M.D., Exhibit A to her Motion to Dismiss the Indictment.

Documents produced by the government in discovery in this case, as well as quotations from the government's own pleadings and press releases in other prosecutions brought against

Warner Chilcott and Warner Chilcott employees, make it absolutely clear that other physicians who entered into the Master Speaker Services Agreement with Warner Chilcott: (1) admitted to accepting kickbacks from Warner Chilcott; (2) allowed Warner Chilcott employees to review patient files and at times remove patient files from their offices; and (3) enjoyed expensive purely-social dinners at fancy restaurants and parties on yachts, all paid for by Warner Chilcott. Not one of these physicians was prosecuted.

**Dr. Luthra's Treatment of Osteoporosis**

The government alleges that Dr. Luthra engaged in criminal conduct by accepting payments under the Master Speaker Services Agreement with Warner Chilcott, and that in exchange she illegally prescribed the bisphosphonate drugs Actonel and Atelvia, both Warner Chilcott products.

Bisphosphonates are a class of drugs that reduce bone resorption by inhibiting osteoclasts. In lay terms, they slow bone loss and increase bone mass. Bisphosphonates typically are poorly absorbed from the gastrointestinal tract, and have major side effects of abdominal discomfort, upper gastrointestinal bleeding, and musculoskeletal pain. Some of the most frequent adverse events associated with all bisphosphonates, including Actonel and Atelvia, are gastrointestinal disorders including diarrhea, abdominal pain, constipation, and vomiting.

Dr. Luthra, as a board-certified obstetrician and gynecologist, had been prescribing Warner Chilcott's drug Actonel, and other bisphosphonates, for years. *See* Affidavit of Rita Luthra, M.D. Because of the gastrointestinal problems typically caused by Actonel and other bisphosphonates, patient "compliance" in taking the drugs as prescribed was often a problem.

Atelvia was a new enteric-coated version of Actonel, which gave Atelvia a supposed superiority over other bisphosphonates in that it would cause less gastrointestinal distress and

could be taken immediately following breakfast, whereas competing oral bisphosphonates, including Actonel, had to be taken 30 to 60 minutes prior to breakfast.  Atelvia's alleged superiority in this regard would supposedly increase patients' compliance in taking the drug as prescribed.

Dr. Luthra had initially been very hopeful regarding the efficacy of Atelvia with respect to patient compliance, as many of her elderly female patients suffered from gastrointestinal problems while taking other oral bisphosphonates.  Typically these patients also suffered from other co-morbidities, including hepatitis, AIDS, and drug abuse, so Dr. Luthra hoped that Atelvia's supposed gastrointestinal advantage would help her patients comply with taking Atelvia, as well as their other medicines.

Unfortunately, Atelvia often failed to work as advertised for many of Dr. Luthra's patients, so after the initial course of treatment with Atelvia for those patients, she switched them to other drugs, such as Fosamax, Boniva, Reclast, or Prolia.  Atelvia did work for some patients, so in those cases Dr. Luthra stopped prescribing the medicine once it had had its desired effect. In other cases, the patient's primary care physician "picked up" the Atelvia prescription from Dr. Luthra (and so of course these prescriptions would not be attributed to Dr. Luthra on any post-2011 data).  In still other cases, Dr. Luthra continued to prescribe Atelvia for those women for whom it was efficacious, until she was forced to close her medical practice and lay off her staff because of the charges brought by the government in this case.  *Id.*

Prior to her indictment, per the request of the Office of the Inspector General of the United States Department of Health and Human Services, Dr. Luthra voluntarily provided 14 specific patient files to the government when government agents came to her office.  Maintaining patient confidentiality, the course of osteoporosis treatment for each of those patients, with

bisphosphonates and other drugs, appears on her affidavit for the Court's review.  Dr. Luthra

urges the Court to review these individual courses of treatment, and while doing so keep in mind

that <u>nowhere</u> in the indictment is it alleged that <u>any</u> prescription she wrote for a Warner Chilcott

product, for <u>any</u> of these patients (or any other of her patients), was somehow "in exchange" for

any payment or "free meal" or alleged paid-for-barbecue that Dr. Luthra received from Warner

Chilcott.

**The Master Speaker Services Agreement**

Dr. Luthra was paid by Warner Chilcott, pursuant to the Master Speaker Services

Agreement, from October 2010 through November 2011.  The government alleges that Dr.

Luthra was a "high volume prescriber of bisphosphonates."  *See* Indictment, ECF# 3, ¶ 11.   The

government alleges that after entering into the Master Speaker Services Agreement, Dr. Luthra's

"prescriptions for Warner Chilcott's bisphosphonate products significantly increased."  *Id*., ¶ 13.

The government also alleges that Dr. Luthra's criminal intent in this case is inferentially

demonstrated by a supposed correlation – that because supposedly once "she was no longer paid

to write products for Warner Chilcott's bisphosphonate products," the amount of her Actonel and

Atelvia prescriptions also supposedly "significantly decreased."  *Id*.

As is set forth below, documents provided by the government in discovery, and

statements by the government attorneys in court filings and press releases in other Warner

Chilcott matters, demonstrate that there certainly were and are other reasons for any decrease in

the prescribing of Actonel and Atelvia by thousands of other American physicians, including:

(1) an overall decrease in the market for bisphosphonates because of possible bisphosphonate-

caused osteonecrosis of the jaw and possible bisphosphonate-caused esophageal cancer; (2) the

fact that Actonel and Atelvia at times did not work as advertised; (3) that for certain patients,

other physicians had "picked up" the patient's Actonel or Atelvia prescription (e.g., a patient's primary care physician); and (4) that the prescribed drug did in fact work for a particular patient, and thus the physician stopped prescribing it.

With respect to Dr. Luthra's contract with Warner Chilcott under the terms of the Master Speaker Services Agreement:

- As of December 13, 2011, Warner Chilcott had 1,989 physicians who were active "speakers" for Warner Chilcott under the Master Speaker Services Agreement. Dr. Luthra was one of those speakers. Spreadsheet produced in electronic "native" format, Bates-stamped WARC-0025-0003372. *See* Exhibit B, Affidavit of Stephen E. Spelman.

- Many of the physicians who entered into the Master Speaker Services Agreement with Warner Chilcott were paid far more than Dr. Luthra. One spreadsheet produced by the government shows that at the time of its creation, Dr. Luthra had been paid $6,000 of the $23,500 she eventually received. Yet the spreadsheet shows that other physicians who had entered into the Master Speaker Services Agreement had, by that same time, already been paid amounts of $76,500, $61,550, $58,000, $56,000, $39,450, $33,000, $31,500, $30,000, $28,500, $27,500, $27,000, $26,250, $26,000, and $24,500. Spreadsheet produced in electronic "native" format, Bates-stamped PV00420756. *Id*.

- In the period from July 1, 2011 to September 23, 2011, a male Western Massachusetts physician, who was also a Warner Chilcott speaker, prescribed more Atelvia than Dr. Luthra did. Spreadsheet produced in electronic "native" format, Bates-stamped WARC-0035-147. *Id*.

- Three male Western Mass physicians were paid $250 more by Warner Chilcott than Dr. Luthra for each Atelvia "med ed" event the male physicians participated in. Spreadsheet Bates-stamped RL_249-255. *Id*.

- In 2011, a male Western Mass physician was paid $2,750 more by Warner Chilcott than Dr. Luthra was for the Atelvia "med eds" he participated in. *Id*.

- The government has stated expressly in its own court filings that other physicians committed health care fraud by receiving kickbacks from Warner Chilcott, even though it has prosecuted none of them. For example: "By paying kickbacks to physicians to induce them to prescribe Warner Chilcott products … Warner Chilcott both defrauded Medicare and other health benefit programs and obtained money from these programs by false or fraudulent representations." Government's Assented-To Motion For Alternative Victim Notification, Document 4; Appendix A, Details of the Offense and Sentencing Guidelines Analysis, Document 14-1, *U.S. v. Warner Chilcott Sales (U.S.) L.L.C.*, 1:15-cr-10327-FDS, p. 11.

- "Federal insurance programs paid Warner Chilcott approximately $27,000,000 during that period. The government estimated, based on the evidence in the case, that approximately half of these prescriptions were the result of an illegal Warner Chilcott inducement, such as a speaker payment, a med ed dinner, a gift card, or some other form of remuneration." *Id.*, p. 12.

- "With respect to the 'speaker' program, 'speakers' were paid $500 to $1,200 per event." Government's Sentencing Memorandum, Document 20, *US v. Warner Chilcott Sales (U.S.) L.L.C.*, 1:15-cr-10327-FDS, p. 4 of 17.

- Moreover, contrary to the government's assertions in the indictment that Dr. Luthra's prescriptions for Atelvia dropped off because she was no longer being paid under the Master Speaker Services Agreement, the government itself has acknowledged that physicians across America failed to support Atelvia, stating, "Atelvia [] did not meet company expectations" and "Atelvia sales were disappointing…." *United States v. W. Carl Reichel*, 1:15-cr-10324-DPW, Government's Trial Brief, ECF# 151, p. 6.

- Similarly, the government has admitted that "… Atelvia [] was not a terribly successful drug…." Government's Assented-To Motion For Alternative Victim Notification, Document 4; Appendix A, Details of the Offense and Sentencing Guidelines Analysis, ECF# 14-1, *US v. Warner Chilcott Sales (U.S.) L.L.C.*, 1:15-cr-10327-FDS, p. 12.

- Moreover, documents produced by the government in this case clearly demonstrate Atelvia's failure. For example, in the first two quarters of 2011, Warner Chilcott's records show that Atelvia was not creating a new market for itself – instead, Atelvia prescriptions were merely "cannibalizing" prescriptions for Actonel, the previous Warner Chilcott bisphosphonate drug. Worse, from Warner Chilcott's perspective, the total number of Actonel <u>and</u> Atelvia prescriptions in those two quarters actually <u>fell</u> from the previous year's numbers for the amount per quarter that Warner Chilcott had been selling of Actonel <u>alone</u>. Spreadsheet produced in electronic "native" format, Bates-stamped WARC-0017-0011774_ATT9Z20G. *See* Exhibit B.

- A Warner Chilcott slide presentation shows that as of August 19, 2011, for all new bisphosphonate prescriptions, Atelvia was being prescribed just over 3 percent of the time. WARC-0035-0005324. *See* Exhibit C, entitled:  "Atelvia DD9-20," slide 5.

- In fact, by the end of November 2011, via a process that Warner Chilcott termed "restructuring," it had decided to stop marketing Atelvia in what it called "17 low opportunity" states.  WARC-0025-0007702. *See* Exhibit D, entitled "Salesforce Restructuring [restructuring meetings nov 2011]," slide 4.

- Part of the rationale for Warner Chilcott's restructuring plan was the "Decline of overall BP [bisphosphonate] market." *Id.*, slide 3.

- As part of the restructuring, Warner Chilcott reduced the number of physicians it was targeting from 91,079 to 37,805.  It reduced the number of Atelvia sales representatives

from 391 to 214.  It reduced the percentage of the new-prescription bisphosphonate market it had been covering from 74% to 48%.  *Id.*, slide 6.

- By October 2011, with data gathered from 367 of Warner Chilcott's Atelvia marketing territories, prescriptions written for Atelvia had a total market share of just over 2 percent.  *Id.*, slide 14.

- By the beginning of December 2011, Warner Chilcott had put in place a business plan for 2012 to implement the restructuring of its Atelvia marketing and sales force.  In the set of slides detailing the plan, one of the reasons given in the plan for the restructuring was that the entire bisphosphonate market was "down due to market contraction."  WARC-0023-0049431.  *See* Exhibit E, entitled "2012 [Atelvia] Business Plan," slide 4.

- Later in the slide deck, on the slide entitled "Category Dynamics," the slide states:  "The bisphosphonate (BP) market experienced accelerated declines in 2011."  The slide also stated:   "Noise continues in BP category:  FDA Advisory Committee meeting (on long term BP use); Label change in 2011 on atypical fractures; ONJ [osteonecrosis of the jaw]; and Esophogeal [sic] cancer." *Id.*, slide 8.

- Under the 2012 Business Plan, trade advertising for Atelvia would be 1/17[th] of what it had been in 2011.  For 2012, the total number of field "med eds" would be less than half of what it had been in 2011.  All spending for market research would cease.  All spending for public relations would cease.  All spending for "direct-to-consumer" efforts would cease.  *Id.*, slide 5.

**Accepting Food**

According to the indictment, Dr. Luthra is also being charged criminally for allegedly writing Actonel and Atelvia prescriptions "[i]n exchange for the free meals" when a Warner Chilcott sales representative called on her in her office and as well for a barbecue at her home that Warner Chilcott allegedly paid for.  *See* Indictment, ECF# 3, ¶ 13.

Warner Chilcott called each visit by one of their sales representatives to a Massachusetts physician a "med ed."  Unlike in most other states in the U.S., in Massachusetts, at the time relevant to the indictment, pharmaceutical companies were not allowed to provide meals to physicians outside the setting of the physician's office or hospital.  *See* 105 CMR § 970.000 (2009).  Thus, unlike in most states, pharmaceutical companies could not sponsor an "evening

out" at a restaurant where, over dinner, one physician would brief other physicians on a new drug.

This Massachusetts regulation regulated the pharmaceutical companies, not the physicians, and provided for the possibility of an imposition of a civil fine – against the pharmaceutical company – if the company were to violate the regulation.  Therefore, when Dr. Luthra met with the Warner Chilcott sales representative in her office during "med eds," and accepted what the indictment terms "free meals," she was complying specifically with the requirements of Massachusetts law, as the Warner Chilcott sales representative was doing the only thing the law allowed him to do – bring food to her in her office.

And in fact, the same agents who interviewed Dr. Luthra also interviewed another local physician who had entered into the Master Speaker Services Agreement – Franklyn Carrington, M.D., whose office was in Agawam, Massachusetts.  Dr. Carrington told the agents that he viewed his lunches with the Warner Chilcott sales representative as "consulting," not speaking.

Dr. Carrington told the agents that from his perspective, when he dealt with sales reps, he was consulting – the sales representative would ask questions about the drug the sales representative was promoting, and he, Dr. Carrington, would respond to the sales representative's questions.  When asked specifically about med eds with the same Warner Chilcott sales representative that called on Dr. Luthra, for which med eds Warner Chilcott also paid Dr. Carrington a speaker fee under the Master Speaker Services Agreement, Dr. Carrington told the agents that he considered himself to be a consultant for those med eds, because he discussed the Warner Chilcott drug with the sales representative.  RL_012495.  *See* Exhibit F.

Dr. Carrington told the agents that he recalled being surprised by the checks he received from Warner Chilcott.  Dr. Carrington told the agents that he did not give the checks back to

Warner Chilcott.  He thought it was appropriate for him to be paid for the med eds, as the sales

representative really picked his brain.  *Id.*

  This standard Massachusetts practice was a far cry from what was going on elsewhere in

the country, even though no other physicians were prosecuted for the following:

- "Atelvia was sold nationwide by approximately 300 sales representatives, who called on thousands of physicians around the country."  Government's Assented-To Motion For Alternative Victim Notification, ECF# 4, *US v. Warner Chilcott Sales (U.S.) L.L.C.*, 1:15-cr-10327-FDS, p. 3.

- "[S]ales representatives had access to virtually unlimited expense accounts for med eds.  The dinners were frequently held at expensive restaurants.  The company nominally capped meals at $129 per attendee.  When this budget was exceeded, some managers instructed the sales representatives to falsely report that additional people attended the dinner, to avoid detection."  Information, ECF# 1, *US v. Warner Chilcott Sales (U.S.) L.L.C.*, 1:15-cr-10327-FDS, ¶ 24, p. 7 of 21.

- "[P]hysicians often ordered the most expensive items on the menu along with expensive wine.  Some physicians ordered extra meals and/or bottles of wine to bring home, and others ordered a restaurant gift card to bring home with them.  Some sales representatives paid for their highest-prescribing physicians to go out to dinner on their own.  *Id.*, ¶ 26, p. 8 of 21.

- "[S]ome sales representatives also gave physicians gift cards to restaurants and other stores.  Many sales representatives paid for office holiday parties as well as parties at clubs and on yachts."  *Id.*, ¶ 27, p. 8 of 21.

- "Sales representatives spent lavishly on physicians.  Some sales representatives allowed physicians to go to dinner without them, using the Warner credit card.  Other sales representatives gave gift cards and other gifts to physicians, expensing them as 'med eds.'"  Government's Sentencing Memorandum, ECF# 20, *US v. Warner Chilcott Sales (U.S.) L.L.C.*, 1:15-cr-10327-FDS, p. 4 of 17.

- "On November 11, 2011, a physician in sales representative 4's district went out to dinner at an expensive New York restaurant, without the sales representative present, and spent $1,778, including alcohol, suckling pig, crab cake platters, and a $550 gift card.  Sales representative 4 expensed the event as a 'med ed.'"  Indictment, ECF# 1, *United States v. W. Carl Reichel*, 1:15-cr-10324-DPW, p. 13 of 17.

- "Sales representative 5, another successful sales representative in DM 5's district, cultivated HCP  [health care provider] 1, a high-prescribing physician, to be a 'speaker.'  Sales representative 5 paid HCP 1 as a 'speaker' when the dinners were mere social events.  Sales representative 5 also paid for HCP 1's office holiday party at a restaurant

and gave HCP 1 a gift card worth several hundred dollars to an expensive New York restaurant, expensing both items as 'med eds.'  HCP 1 prescribed Atelvia for numerous patients, in part, in exchange for these payments."  *Id*.

- "On or about April 1, 2011, sales representative 8 took out a number of physicians to an expensive restaurant at the Foxwoods casino in Connecticut.  Sales representative 8 expensed the dinner, which cost approximately $4,500, as a 'med ed.'  Sales representative 8 also held 'med ed' dinners at an expensive steakhouse at the Mohegan Sun casino in Connecticut on several occasions.  Sales representative 8 and other sales representatives in New England also provided gift cards and other gifts to physicians to induce them to prescribe Warner Chilcott products.  Sales representative 8 and other sales representatives in New England also provided remuneration to physicians' employees to induce them to prepare prior authorizations for Atelvia."  *Id*., pp. 14-15.

- "[A] sales representative held a 'med ed' at a tango dancing event."  Government's Response To Defendant's Objections To Certain Exhibits, Document 209, *U.S. v. Reichel*, p. 3.

When Doctor Luthra met with the Warner Chilcott sales representative in her office regarding Actonel and Atelvia, she usually had a bagel.

**The Alleged "Paid-For" Barbecue**

Dr. Luthra flat-out denies that Warner Chilcott paid for a barbecue at her house.  But, even taking the allegation as true, as the Court must do at this stage, Dr. Luthra would have broken no law by having Warner Chilcott pay for a barbecue, although Warner Chilcott would have, pursuant to 105 CMR 970.000 (2009).

**Prior Authorizations**

Dr. Luthra has also been charged criminally because a Warner Chilcott sales representative supposedly filled out prior authorization ("PA") forms in Dr. Luthra's office, using patient data he culled from patient files, on days when Dr. Luthra was not in the office.  No other physician in America is being prosecuted for this.  Yet from the discovery provided by the government, it is absolutely clear that other physicians knew that Warner Chilcott employees

were filling out prior authorizations for Atelvia, and thus had access to protected patient

information.  Yet none of them were prosecuted.  For example:

- Dr. Jason Boutros admitted to federal agents that not all things listed on the Atelvia prior authorizations his office submitted were true.  He said it was not always true that patients tried the medications as indicated on the prior authorizations and was not sure how accurate some of the particulars were.  RL_012483-84.  *See* Exhibit G.

- Dr. Shovek Boyadjian told agents that sometimes the Warner Chilcott sales representative would come back to her office and together they would go over patients' medical charts.  Dr. Boyadjian told the agents that she would go over the charts with the sales representative because the sales representative wouldn't be able to read her handwriting.  Dr. Boyadjian would tell the sales representative what medication the particular patient was on.  The Warner Chilcott sales representative would then type in the reasons justifying why the patient(s) needed to be on Atelvia.  RL_012487-89.  *See* Exhibit H.

- Dr. Robert Flores admitted to federal agents that he had lied to them when he first spoke with them about prior authorizations for Atelvia.  Dr. Flores told the agents that with respect to his patients, in fact the Warner Chilcott sales representative had completed all the prior authorizations for Atelvia.  Whenever Dr. Flores got a denial from an insurance company with respect to paying for an Atelvia prescription he had written, he would give the denial to the Warner Chilcott sales representative, along with the patient's medical chart, so that the sales representative could complete and submit a prior authorization form.  RL_012572-80.  *See* Exhibit I.

- Dr. Dhiman Basu admitted to allowing the Warner Chilcott sales representative to fill out prior authorizations.  Dr. Basu agreed that this violated HIPAA.  RL_012453-54. *See* Exhibit J.

- Dr. Ramon Pimentel admitted to allowing the Warner Chilcott sales representative to write prior authorizations, which would have required the sales representative to have access to patient files.  RL_012864-69.  *See* Exhibit K.

## ARGUMENT

### All Three Counts of the Indictment Must Be Dismissed

A district court has the power to dismiss an indictment prior to trial.  *See* Fed. R. Crim. P.

12.  In addition, Federal Rule of Criminal Procedure 7(c)(1) implements the Sixth Amendment

requirement that an accused "be informed of the nature and cause of the accusation" through its

requirement that the indictment "must be a plain, concise, and definite written statement of the

essential facts constituting the offense charged." *Cole v. Arkansas*, 333 U.S. 196, 201 (1948).

An indictment is only sufficient "if it contains the elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and enables him to enter a plea without fear of double jeopardy." *United States v. Yefsky*, 994 F.2d 885, 893 (1st Cir. 1993) (citing *Hamling v. U.S.*, 418 U.S. 87, 117 (1974)).  To be sufficient, an indictment must "be accompanied by such a statement of facts and circumstances as to inform the accused of the specific offense with which he is charged." *United States v. Savarese*, 686 F.3d 1, 6 (1st Cir. 2012).  "Specifically, in cases alleging fraud, where 'guilt depends so crucially upon such *a specific identification of fact* . . . an indictment must do more than simply repeat the language of the criminal statute.'" *United States. v. Cranney*, 14-cr-10276 (D. Mass., March 29, 2016) (citing *Yefsky* at 893*,* including emphasis in original, internal quotation marks omitted).

### Count One Must Be Dismissed:  The Anti-Kickback Statute
### 42 U.S.C. § 1320a-7b(b)(1)(B)

Count One of the indictment is defective and insufficient in many ways, and thus must be dismissed.  Count One fails because of a lack of specificity, as is required by Rule 12(b)(3)(B)(iii) and Rule 7(c)(1).  Count One also fails to state an offense, as is required by Rule 12(b)(3)(B)(v) and Rule 7(c)(1).  Finally, Count One is duplicitous, and thus violates Rule 12(b)(3)(A)(iv) and Rule 7(c)(1).

### Lack of Specificity

Contrary to the mandates of the Sixth Amendment, the Federal Rules of Criminal Procedure, as well as *Yefsky* and its progeny, Count One of the indictment against Dr. Luthra fails to "inform the accused of the specific offense." *Yefsky* at 893.

Quite simply, what Count One appears to allege is that from October 2010 to November 2011 Dr. Luthra merely engaged in the practice of medicine.  She saw patients, she prescribed

medicine for them, she spoke with pharmaceutical sales reps who called on her office and brought her lunch or breakfast (which was exactly, and only, what they were allowed to do under 105 CMR 970.000 (2009)), and she contracted with Warner Chilcott to provide expert information to their sales representative about Atelvia.  There is _no_ allegation in the indictment that any of this was anything other than absolutely legal and above-board.

The only apparent "factual" allegation of criminal conduct in Count One appears in paragraph 13 of the indictment.  The alleged "fact" posited by paragraph 13 is the supposed existence of an unspecified correlation between the receipt by Dr. Luthra, on unspecified dates, of unspecified payments and unspecified items of food from Warner Chilcott (on the one hand), and the prescribing by Dr. Luthra of an unspecified number of unspecified prescriptions of unspecified Warner Chilcott products for unspecified patients on unspecified dates (on the other hand).  (If the previous sentence seems confusing, it is only because it precisely reflects the language of Count One).

According to the indictment, this alleged unspecified correlation between Dr. Luthra's unspecified prescriptions of unspecified Warner Chilcott products for her unspecified patients on unspecified dates was "in exchange" for both unspecified payments from Warner Chilcott and for unspecified "free meals" from Warner Chilcott.

Count One thus absolutely fails to provide the "specific identification of fact" required by *Yefsky* and *Hamling* so that Dr. Luthra can be informed of what specific allegations she must defend against, and also protect herself from the possibility of double jeopardy.

Caselaw in the First Circuit is replete with examples of the importance of specific factual allegations in indictments with respect to whether or not those indictments complied with the mandates of *Yefsky* and *Hamling*, especially in fraud cases.  *See, e.g., U.S. v. Savarese*, 686 F.3d

1, 6-7 (1st Cir. 2012) (indictment sufficient where the relevant counts included a chart showing

the specific individual dates of alleged criminal conduct and the specific identification of each

related victim); *U.S. v. Cianci*, 378 F.3d 71, 81 (1st Cir. 2004) (lengthy and detailed factual

allegations provided necessary specificity to apprise defendants of the charges); *U.S. v.*

*Sepulveda*, 15 F.3d 1161, 1192 (1st Cir. 1993) (indictment sufficient as it stated that the

defendant's residence was used as a packaging center for the drug distribution ring, and  that she

worked as a "runner" and a "street-level dealer," and the court held that this factual information

"sufficiently spelled out the crime, apprised [the defendant] of the charge against which she had

to defend, and protected her from the boggart of double jeopardy."); *U.S. v. Allard*, 864 F.2d

248, 250 (1st Cir. 1989) (information sufficient because it fairly described the crime and its

victims, and it described the offense "with sufficient clarity to show a violation of law, and

enable the accused to know the nature and cause of the accusation against him.") (quoting *U.S. v.*

*Fusaro,* 708 F.2d 17, 23 (1st Cir.)), *cert. denied*, 464 U.S. 1007 (1983); *U.S. v. Murphy*, 762 F.2d

1151, 1153-55 (1st Cir. 1985) (reversing conviction for witness tampering where the indictment

failed to indicate which, among many possible "official proceedings," the defendants had

allegedly interfered in and where the government posited multiple theories at trial, thus

hampering the defendants' ability to defend themselves); *U.S. v. Cranney*, 14-cr-10276 (D.

Mass., March 29, 2016) (indictment sufficient because along with a detailing of the "many" acts

taken by the defendant as part of his scheme, each wire-fraud count in the indictment described

the content of a wire transmission and to which victim or victims and the approximate date on

which the wire was sent, and each mail-fraud count in the indictment described a mailing

allegedly in furtherance of that scheme, including details about its content, the alleged recipient-

victim of that mailing, and the date on which the mailing was sent).

Indeed, a recent case from the District of New Jersey, *U.S. v. Greenspan*, Cr. No. 16-114 (WHW) (D.N.J., Aug. 16, 2016) provides an excellent example of a sufficient indictment **in an anti-kickback case**, and hence is worth quoting at some length.  In that case, U.S. District Judge William Walls, in analyzing the sufficiency of indictments under the anti-kickback statute, held:

> The indictment adequately alleges the elements of the three Anti-Kickback violations and conspiracy to violate the Anti-Kickback Statute.  Count Two alleges that Defendant Greenspan received a kickback/bribe on July 13, 2011 in return for the referral of blood tests to BLS for which payment was made, in whole or in part, under the Medicare program. ECF No. 1 ¶¶ 1, 2.  Count Three alleges that Defendant received a kickback/bribe on December 14, 2011 in return for the referral of blood tests to BLS for which payment was made, in whole or in part, under the Medicare program. *Id.*  Count Four alleges that Defendant received a kickback/bribe on December 12, 2012 in return for the referral of blood tests to BLS for which payment was made, in whole or in part, under the Medicare program. *Id.*  Counts Two through Four incorporate the factual allegations of Count One, the conspiracy charge: the indictment specifically identifies the bribe alleged in Count Two as a $1,500 "consulting agreement" bribe from Advantech deposited in a bank account held in the name of Dr. Greenspan DO PA, alleges that Defendant caused blood tests to be referred to BLS on July 13, 2011, and alleges that BLS received a wire of approximately $300 from Medicare as payment for the blood tests on August 11, 2011, *id.* ¶ 11(b)-(d); identifies the bribe alleged in Count Three as payment for a holiday party for Defendant's office staff at the Capital Grille in Paramus, New Jersey on December 14, 2011, and alleges that Defendant caused blood tests to be referred to BLS on December 15 and December 17, 2011, *id.* ¶ 11(k)-(m); and identifies the bribe alleged in Count Four as payment from BLS for a holiday party for his office staff at the Capital Grille in Paramus, New Jersey on December 12, 2012, and alleges that Defendant caused a blood test to be referred to BLS on December 15, 2012. *Id.* ¶ 11(ff)-(hh).

*U.S. v. Greenspan*, Cr. No. 16-114 (WHW) (D.N.J., Aug. 16, 2016).

The tight, focused, and specific language of the indictment in *Greenspan* is a far cry from the vague, amorphous, and nebulous language in Count One of the indictment at bar.  The loose language of Count One makes it impossible to even guess at what specific conduct the grand jury found to be worthy of indictment.  This makes it impossible for Dr. Luthra to prepare to defend herself against Count One, because she cannot know what conduct it may have been that the grand jury found probable cause to believe was criminal.

For example, it was not contrary to law for Dr. Luthra to enter into a consulting agreement with Warner Chilcott, as 1,989 other American physicians did (and, moreover, such consulting agreements are in fact excepted from the Anti-Kickback Statute as "safe harbor" exceptions to the terms of the statute, pursuant to sub-paragraph (b)(3)(B) of the Anti-Kickback Statute and 42 C.F.R. § 1001.952(d)), so Count One contains no information regarding which specific payment or payments that Dr. Luthra received were contrary to law.  Was it the payments for the training she engaged in?  If so, which specific payments?  Was it the payments for the "med ed" events?  If so, which specific ones?  If any payment was contrary to law, why?  And what, specifically, did Dr. Luthra provide to Warner Chilcott "in exchange" or "in return" for it?

Likewise, Count One provides no information with respect to Dr. Luthra's alleged criminal conduct regarding the food she ate during the med eds.  If consuming any of the food she was brought is somehow alleged to be a criminal act, which food, and on which dates?  Was it perhaps food at the barbecue that Warner Chilcott allegedly paid for?  Count One provides no information at all.  (As stated before, Dr. Luthra denies that Warner Chilcott paid for a barbecue for her, but even taking the allegation as true, as the Court must at this stage, Dr. Luthra would have broken no law to have Warner Chilcott pay for the barbecue (although Warner Chilcott would have, pursuant to 105 CMR 970.000 2009)).  In any event, when was this barbecue, and how much did Warner Chilcott allegedly pay for it?

Moreover, Count One never once specifically describes how Dr. Luthra engaged in criminal conduct "in return" for the alleged payments.  Was it when Dr. Luthra wrote a prescription?  If so, which prescription, for which patient?  When was that prescription written?  And why was the prescription not appropriate, given such critical factors as the particular

patient's medical condition, medical history, and the possible impact of harmful interactions with other drugs the patient was taking?  Moreover, how much did Medicare pay for that prescription?  When did Medicare pay for that prescription?  Why was writing that particular prescription contrary to law by being "in return" for payment from Warner Chilcott, if there is no allegation that any prescription was anything but medically necessary, and no allegations at all that Dr. Luthra ever improperly substituted a Warner Chilcott product for some other drug?

And what if the prescription was written, but never filled, as the government alleges in another count in the indictment?  Has that unfilled prescription violated the Anti-Kickback Statute in any way?  If so, how?

These are just some of the issues caused by the vague, amorphous, nebulous, and legally insufficient language of Count One.  For this lack of specificity alone, which precludes Dr. Luthra from having notice of the specific allegations against her, and causes her to be unable to defend herself in this case, Count One should be dismissed.

Of course, an invalid indictment such as Count One cannot be "saved" by a Bill of Particulars.  "To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of the grand jury was designed to secure.   For a defendant would then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him."  *Russell v. U.S.*, 369 U.S. 749, 770 (1962); *U.S. v. Murphy*, 762 F.2d 1151, 1154 (1st. Cir. 1984).  Thus Count One must be dismissed.

**Lack of an Allegation of Mens Rea**

Count One should also be dismissed because it fails to allege the necessary *mens rea*, and thus fails to even state an offense.  Since the government must prove that Dr. Luthra acted "willfully," the indictment must at least allege *facts* that Dr. Luthra's primary purpose for receiving any alleged remuneration was to do something purposely that the law forbids, with a corrupt intent to violate the law.  *U.S. v. Bay State Ambulance and Hospital Rental, Inc.*, 874 F.2d 20, 29-30, 33 (1st Cir. 1989).  Yet as detailed above, Count One alleges no such facts, and thus fails to satisfy the *mens rea* requirement.  None of Dr. Luthra's alleged conduct – receipt of funds under the Master Speaker Services Agreement, eating food at med eds, or even having Warner Chilcott pay for a barbecue (which they didn't) is illegal in any way.  Missing any factual allegation of mens rea, Count One simply fails state an offense, and hence must be dismissed.

**Duplicity**

Count One also has the fatal defect of being so vague that trial might proceed upon an entirely different concept than whatever the grand jury contemplated when it returned the indictment.  If the indictment is not dismissed, Dr. Luthra will be subjected to a substantial risk of being convicted on a basis other than the one for which the grand jury indicted her.  Under the statute, each receipt of an alleged kickback is a separate offense, separately punishable.  The crime that is alleged in Count One is the receipt of alleged kickbacks from Warner Chilcott. Each receipt of a kickback would be a separate, discrete payment, and hence would constitute a separate, discrete offense as a kickback in violation of the statute, with each kickback having a separate penalty under the statute.  Yet none of these receipts of payment, or receipts of food, are individually set out, but are instead mushed together into a meaningless mash of indefiniteness,

to the extent that twelve separate jurors could theoretically convict Dr. Luthra for twelve separate receipts of payment, with each of the jurors believing that none of the other receipts of payment was sufficient to convict her.  Given the alleged multiple payments to Dr. Luthra by Warner Chilcott over 13 months, and Dr. Luthra's alleged multiple prescriptions of Warner Chilcott products in return for those payments, the vague allegations of Count One render it impossible for a jury to convict on one discrete receipt of payment while acquitting on one of the other payments (or receipts of "free meals") also alleged in Count One.

The duplicitous nature of Count One prejudices Dr. Luthra in many ways:  she is subject to prejudice in the shaping of evidentiary rulings; if convicted, she is subject to prejudice in sentencing; and she is also subject to prejudice in limiting appellate review.  Moreover, she is exposed to double jeopardy in any subsequent prosecution, which is a Fifth Amendment violation.  Again, as is set forth in more detail *supra* on p.17, an invalid indictment such as Count One cannot be "saved" by a Bill of Particulars.  *Russell v. U.S.*, 369 U.S. 749, 770 (1962); *U.S. v. Murphy*, 762 F.2d 1151, 1154 (1st. Cir. 1984).   Because of the duplicitous nature of Count One, and the resulting prejudice to Dr. Luthra, Count One must be dismissed.  *See Yefsky*, 994 F.2d at 893.

**Count Two Should Be Dismissed:  HIPAA Violation**
**42 U.S.C. § 1320d-6**

**Lack of Specificity**

Count Two suffers from the same fatal flaw as Count One, in that it fails to comply with the specificity mandates of the Sixth Amendment, Rule 7(c)(1), and *Yefsky*.  As with Count One, the lack of specificity in Count Two fails to inform Dr. Luthra of the specific offense or offenses of which she is accused, and thus she is unable to prepare her defense.  For example, nowhere in Count Two is it alleged which particular patient or patients had their individually identifiable

health information disclosed to the Warner Chilcott sales representative.  Nowhere in Count Two is it alleged exactly what particular information was disclosed.  Nowhere in Count Two is it alleged on which particular date or dates the information was allegedly disclosed.   It is not even alleged how many times this information was supposedly disclosed.  It is therefore impossible for Dr. Luthra to prepare a defense to Count Two, and hence it must be dismissed.  *See, e.g., U.S. v. Savarese*, 686 F.3d 1, 6-7 (1st Cir. 2012) (indictment sufficient where the relevant counts included a chart showing the specific individual dates of alleged criminal conduct and the specific identification of each related victim); *U.S. v. Murphy*, 762 F.2d 1151, 1153-55 (1st Cir. 1985) (reversing conviction for witness tampering where the indictment failed to indicate which, among many possible "official proceedings," the defendants had allegedly interfered in and where the government posited multiple theories at trial, thus hampering the defendants' ability to defend themselves); *U.S. v. Cranney*, 14-cr-10276 (D. Mass., March 29, 2016) (indictment sufficient because along with a detailing of the "many" acts taken by the defendant as part of his scheme, each wire-fraud count in the indictment described the content of a wire transmission and to which victim or victims and the approximate date on which the wire was sent, and each mail-fraud count in the indictment described a mailing allegedly in furtherance of that scheme, including details about its content, the alleged recipient-victim of that mailing, and the date on which the mailing was sent); *U.S. v. Greenspan*, Cr. No. 16-114 (WHW) (D.N.J., Aug. 16, 2016) (with lengthy quotation of detailed allegations set out *supra* on p.15).  The tight, focused, and specific language of the indictments in all of these cases is a far cry from the vague, amorphous, and nebulous language in Count Two.  The loose language of Count Two makes it impossible to even guess at what specific conduct – which prior authorizations, for which patients, for which prescriptions, on which dates – the grand jury found to be worthy of indictment.  This makes it

impossible for Dr. Luthra to prepare to defend herself against Count Two, because she cannot

know what conduct it may have been that the grand jury found probable cause to believe was

criminal.  Again, as is set forth in more detail *supra* on p.17, an invalid indictment such as Count

Two cannot be "saved" by a Bill of Particulars.  *Russell v. U.S.*, 369 U.S. 749, 770 (1962); *U.S.

v. Murphy*, 762 F.2d 1151, 1154 (1st. Cir. 1984).   Because of the lack of specificity in Count

Two, and the resulting prejudice to Dr. Luthra, Count Two must be dismissed.  *See Yefsky*, 994

F.2d at 893.

**Duplicity**

Also, as with Count One, the lack of specificity in Count Two subjects Dr. Luthra to the

peril and prejudice of a duplicitous charge.  Because of the vagueness of the language in Count

Two, it is impossible to determine what specific particular conduct the grand jury believed to be

criminal.  The crime that is alleged in Count Two is that Dr. Luthra allegedly disclosed patient

information to the Warner Chilcott sales representative.  Each such disclosure constitutes a

separate, discrete offense in violation of the statute, with each such disclosure having a separate

penalty under the statute.  Yet none of these disclosures are individually set out.  Therefore,

twelve separate jurors could theoretically convict Dr. Luthra for twelve separate disclosures, with

each of the jurors believing that none of the other disclosures was sufficient to convict her.

Given the alleged multiple disclosures over 13 months, the vague allegations of Count Two

render it impossible for a jury to convict with respect to one discrete disclosure while acquitting

on one of the disclosures also alleged in Count Two.

The duplicitous nature of Count Two prejudices Dr. Luthra in many ways:  she is subject

to prejudice in the shaping of evidentiary rulings; if convicted, she is subject to prejudice in

sentencing; and she is also subject to prejudice in limiting appellate review.  Moreover, she is

exposed to double jeopardy in any subsequent prosecution, which is a Fifth Amendment

violation.  Again, as is set forth in more detail *supra* on p.17, an invalid indictment such as Count

Two cannot be "saved" by a Bill of Particulars.  *Russell v. U.S.*, 369 U.S. 749, 770 (1962); *U.S.*

*v. Murphy*, 762 F.2d 1151, 1154 (1st. Cir. 1984).   Because of the duplicitous nature of Count

Two, and the resulting prejudice to Dr. Luthra, Count Two must be dismissed.  *See Yefsky*, 994

F.2d at 893.

### Count Three Must Be Dismissed:  Obstruction of a Criminal Investigation of a Health Care Offense
### 18 U.S.C. § 1518

### Failure To State an Offense

Count Three must be dismissed for several reasons.  To begin with, it does not allege a

crime.  Count Three is based on 18 U.S.C. § 1518, which makes it a crime to willfully prevent,

obstruct, mislead, delay or attempt to prevent, obstruct, mislead, or delay the communication of

information and records relating to "a violation of a <u>Federal health care offense</u>."  *See* 18 U.S.C.

§ 1518 (emphasis supplied).  The term "Federal health care offense" is a defined term in Title 18,

and the definition for the term is found in 18 U.S.C. § 24.  The relevant portion of 18 U.S.C.

§ 24 reads as follows:

> (a) As used in this title, the term "Federal health care offense" means a violation of, or a criminal conspiracy to violate—
>
> (1) section 669, 1035, 1347, or 1518 of this title or section 1128B of the Social Security Act (42 U.S.C. 1320a–7b); or
>
> (2) section 287, 371, 664, 666, 1001, 1027, 1341, 1343, 1349, or 1954 of this title section 301 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 331), or section 501 of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1131), or section 411, 518, or 511 of the Employee Retirement Income Security Act of 1974,, [sic] if the violation or conspiracy relates to a health care benefit program.

*Id*.  What is clear from reading 18 U.S.C. § 24 is what is <u>not</u> a covered "Federal health care

offense" under the statute:  any conduct relating to Count Two of the indictment, which falls

under 42 U.S.C. § 1320d-6 (§1177(a) of the Social Security Act), as 42 U.S.C. § 1320d-6 is <u>not</u>

one of the statutes designated as a "Federal health care offense."

Thus, any conduct Dr. Luthra is alleged to have engaged in that relates to Count Two (Dr.

Luthra's alleged communications with Medical Assistant #1 relating to the alleged HIPAA

violations of Count Two) simply cannot be part of the allegations under Count Three.  That is

because Dr. Luthra's alleged communications with her medical assistant relating to the HIPAA

violation alleged in Count Two, by definition, do not fall within the scope of 18 U.S.C. § 1518.

Although, theoretically, such conduct might be a violation of some other statute in Title

18, it is not, by definition, a violation of 18 U.S.C. § 1518.  And thus, with respect to any

communications Dr. Luthra may have had with Medical Assistant 1 relating to the HIPAA

violation alleged in Count Two, Count Three fails to allege a crime, and so must be dismissed,

because the facts contained in the allegations fall beyond the scope of the statute.  *See, e.g., U.S.

v. Vitillo*, 490 F.3d 314, 320-21 (3rd Cir. 2007) (indictment insufficient if facts within its four

corners fall beyond the scope of the relevant criminal statute).

**<u>The Remainder of Count Three Also Fails to State an Offense</u>**

Even though the Anti-Kickback Statute relating to Count One <u>is</u> included in the definition

of a "Federal health care offense" in 18 U.S.C. § 24, Count Three of the indictment nevertheless

<u>also</u> fails to state an offense with respect to any alleged obstruction relating to the Anti-Kickback

Statute.

With respect to the conduct relating to the Anti-Kickback Statute, Count Three alleges

that Dr. Luthra gave federal agents "information she knew to be false."  Indictment, ECF# 3,

¶ 21.  But an examination of the language of Count Three reveals no allegations of actual falsehoods.

Paragraph 22 of the indictment contains the statement:  "Luthra told the HHS agents that Warner Chilcott paid her to read studies and provide her opinion."  There is no falsehood there, particularly as the indictment itself alleges in paragraph 12 that Dr. Luthra was paid for $23,500 for speaker training and med ed events during which she spoke with the Warner Chilcott sales representative.

The only other allegations in Count Three regarding falsehoods occur in Paragraph 25. Paragraph 25 alleges that Dr. Luthra made statements "contrary to her prior statements."  But (putting aside for the moment whether an alleged "contrary" statement satisfies the mens rea and materiality requirements of 18 U.S.C. § 1518), Dr. Luthra's alleged statements in paragraph 25 are not actually contrary to anything, even if taken as true, as they must be at this point.  In fact, upon examination of the language in paragraph 25, it is not Dr. Luthra's statements that are contrary to anything, but rather the allegations themselves, which are hopelessly and confusingly contrary to each other, and fatally so.

First, the second sentence of paragraph 25 alleges that by stating she was paid $3,250 in 2010 for training to become a speaker, and $19,500 in 2011 for a research paper she wrote, Dr. Luthra somehow contradicted her previous statement in paragraph 22, that she was paid for $23,500 for speaker training and med ed events during which she spoke with the Warner Chilcott sales representative.  But there is no contradiction present – Dr. Luthra simply provided additional, and more specific, information.

And clearly, in the next sentence of paragraph 25, it is the allegations of the indictment that are contrary to each other, as the allegations in that sentence flat-out contradict the

allegations in the previous sentence.  That next sentence states:  "Specifically, Luthra stated that Warner Chilcott paid her to read 25 abstracts of clinical trials and that she wrote a 5,000 word paper on "Osteoporosis Prevention and How to Identify Patients Early and Achieve Compliance."  What jumps out from that sentence is, of course, the word "specifically."  If that is what Dr. Luthra "specifically" said, then, <u>contrary</u> to the previous sentence, she did <u>not</u> say that Warner Chilcott had <u>paid</u> her to write the paper.

This by itself is enough for the indictment to be dismissed, as the <u>specific</u> statement Dr. Luthra is alleged to have made is <u>also contrary</u> to the final, conclusory sentence of the paragraph alleging she conveyed false information to the agents:  "Luthra knew that Warner Chilcott had not paid her to write a research paper."

The inarticulate and contradictory language of Count Three thus does not even state a crime, as there is no lucid statement of allegations, as is required pursuant to Rule 7(c)(1), that Dr. Luthra in any way willfully prevented, obstructed, misled, delayed or attempted to prevent, obstruct, mislead, or delay the communication of information to the agents.

**<u>Mens Rea and Materiality</u>**

Additionally, Count Three does not state an offense, as Dr. Luthra's alleged conduct with respect to Count Three involves, at most, an alleged false statement relating to a paper she wrote, which, even if taken as true, does not fall within the ambit of the obstruction statute.  The Supreme Court of the United States in *Aguilar* held that simply speaking falsely to an investigating agent was insufficient to meet the requirements of 18 U.S.C. § 1503.  *See Aguilar*, 515 U.S. at 601.  In *Aguilar*, the Supreme Court imposed a materiality requirement on the broad reach of § 1503, requiring that "the endeavor must have the natural and probable effect of interfering with the due administration of justice." *Aguilar,* 515 U.S. at 599 (internal quotation

marks omitted).  Yet Count Three nowhere alleges how <u>any</u> of the statements allegedly made by

Dr. Luthra could possibly have had the natural and probable effect of interfering with the due

administration of justice or the agents' investigation.  *See United States v. Wood*, 6 F.3d 692, 697

(10th Cir. 1993) (obstruction of justice charge was inadequate as a matter of law because the

undisputed facts showed that the FBI did not terminate their investigation based on the

defendant's false, self-serving, exculpatory statements, and therefore the statements "did not have

the natural and probable effect of impeding the due administration of justice.")  Thus Count

Three must be dismissed.

**<u>Lack of Specificity</u>**

Moreover, the inarticulate and contradictory language of Count Three yet again fails to

adequately inform Dr. Luthra of the specific allegations against her so that she can defend

herself.  Yet again, the lack of specificity is fatal, as it is absolutely unclear what the grand jury

contemplated when it indicted on Count Three.  For example, did the grand jurors have in mind

that Dr. Luthra simply did not actually write the paper?  Did they have in mind that she actually

<u>did</u> write the paper, but that Warner Chilcott did not pay her to write it?  Or did they have in

mind that she did <u>not</u> write the paper, but falsely claimed she did?  Another possibility – did the

grand jurors have in mind that not only did she not write the paper, but she additionally falsely

claimed that Warner Chilcott paid her to write one?  Or perhaps, whatever the status of the

existence of the paper, did the grand jurors have in mind that she falsely claimed to have given a

copy of the paper to Warner Chilcott?  Or, again, whatever the status of the existence of the

paper, did the grand jurors have in mind that she falsely claimed that she gave a copy of the

paper to the World Health Organization?

Because of the failure of the specificity requirement, it is impossible for Dr. Luthra to prepare a defense to Count Three, and hence it must be dismissed.  *See, e.g., U.S. v. Savarese*, 686 F.3d 1, 6-7 (1st Cir. 2012) (indictment sufficient where the relevant counts included a chart showing the specific individual dates of alleged criminal conduct and the specific identification of each related victim); *U.S. v. Murphy*, 762 F.2d 1151, 1153-55 (1st Cir. 1985) (reversing conviction for witness tampering where the indictment failed to indicate which, among many possible "official proceedings," the defendants had allegedly interfered in and where the government posited multiple theories at trial, thus hampering the defendants' ability to defend themselves); *U.S. v. Cranney*, 14-cr-10276 (D. Mass., March 29, 2016) (indictment sufficient because along with a detailing of the "many" acts taken by the defendant as part of his scheme, each wire-fraud count in the indictment described the content of a wire transmission and to which victim or victims and the approximate date on which the wire was sent, and each mail-fraud count in the indictment described a mailing allegedly in furtherance of that scheme, including details about its content, the alleged recipient-victim of that mailing, and the date on which the mailing was sent); *U.S. v. Greenspan*, Cr. No. 16-114 (WHW) (D.N.J., Aug. 16, 2016) (with lengthy quotation of detailed allegations set out *supra* on p.15).  The tight, focused, and specific language of the indictments in all of these cases is a far cry from the contradictory and nonsensical language in Count Three.  The language of Count Three makes it impossible to even guess at what specific conduct – which statements, to whom, and regarding what – the grand jury found to be worthy of indictment.  This makes it impossible for Dr. Luthra to prepare to defend herself against Count Three, because she cannot know what conduct it may have been that the grand jury found probable cause to believe was criminal.  And again, as is set forth in more detail *supra* on p.17, an invalid indictment such as Count Two cannot be "saved" by a Bill of

Particulars. *Russell v. U.S.*, 369 U.S. 749, 770 (1962); *U.S. v. Murphy*, 762 F.2d 1151, 1154 (1st. Cir. 1984). Because of the failure of the specificity requirement in Count Three, and the resulting prejudice to Dr. Luthra, Count Three must be dismissed. *See Yefsky*, 994 F.2d at 893.

**Duplicity**

Given the profound problems with the language of Count Three, it is clear that the count must be dismissed because of the prejudice to Dr. Luthra from duplicity alone. To begin with, as written, Dr. Luthra could be convicted under Count Three either for her statements about her research paper, for alleged "contrary" statements that are not actually contrary, or for her alleged statements to her medical assistant. Putting aside the fact that none of those allegations actually amount to criminal conduct, if Dr. Luthra were to be convicted on this count, in would be unclear what conduct she had actually been convicted for.

The duplicitous nature of Count Two prejudices Dr. Luthra in many ways: she is subject to prejudice in the shaping of evidentiary rulings; if convicted, she is subject to prejudice in sentencing; and she is also subject to prejudice in limiting appellate review. Moreover, she is exposed to double jeopardy in any subsequent prosecution, which is a Fifth Amendment violation. Because of the duplicitous nature of Count Three, and the resulting prejudice to Dr. Luthra, Count Three must be dismissed. *See Yefsky*, 994 F.2d at 893.

**Failure To Allege The Required Nexus**

Finally, another reason that Count Three must be dismissed is because 18 U.S.C. § 1518 requires that in the indictment a nexus must be alleged between the alleged obstructive action and some matter within the jurisdiction of the United States, and the indictment fails to sufficiently allege such a nexus.

Although the United States Supreme Court has not directly addressed the issue with respect to 18 U.S.C. § 1518, it has required such a nexus be alleged in indictments with respect to §§ 1503 and 1512(b)(2) of Title 18.  *See Aguilar,* 515 U.S. at 598-600.  Both §§ 1503 and 1512(b)(2) are obstruction of justice statutes under Chapter 73 of Title 18 of the United States Code, as is § 1518.  Because of the similarities between §§§ 1503, 1512(b)(2) and 1518, the indictment must also allege such a nexus in a § 1518 count, which Count Three fails to do.

The *Aguilar* Court read the nexus requirement into § 1503 because the broad, catch-all provision of the statute could encompass innocent acts.  The Court held that absent a nexus between the act and a official proceeding, there could be no "evil intent to obstruct," or criminal culpability.  *Id.* at 599.  The Court held that "if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding [the nexus], he lacks the requisite intent to obstruct" and therefore is not properly charged under § 1503.  *Id.* at 599.  The same should apply with respect to a charge under § 1503.  Similarly, in *Arthur Andersen LLP v. United States,* the Court held that 18 U.S.C. § 1512(b)(2) also requires a nexus between a defendant's acts and an official proceeding that those acts obstructed or could obstruct. 544 U.S. 696, 708 (2005).

Section 1518, when read alongside §§ 1503 and § 1512(b)(2), contains similar language to that which led the Court to read a nexus requirement into those statutes. All three of these statutes are found under Section 73 of the criminal code under the heading "Obstruction of Justice."  Each statute requires an action of obstruction of justice.  Each statute also requires some sort of federal proceeding or activity: the due administration of justice, an official proceeding, or an ongoing federal investigation.  While each statute encompasses different actions and different proceedings, the effect of each statute is the same.  The action must be intended to affect the federal proceeding or investigation covered in the statute.  This is the nexus

that is required by *Aguilar* and *Arthur Andersen*, and thus the policy underlying the nexus

requirement of §§ 1503 and 1512(b)(2) requires that the nexus requirement be applied to § 1518.

In this case, Count Three does not allege a nexus between Dr. Luthra's conduct and a

federal investigation, as Count Three does not in any way allege that anything Dr. Luthra may

have said had a "natural and probable effect of interfering with the government's investigation.

Clearly it did not, as the investigation continued after Dr. Luthra spoke with the agents.  As the

10th Circuit held in *Wood*, 6 F.3d at 696-97, in the course of dismissing an indictment for

obstruction pursuant to 18 U.S.C. § 1503:

> We find it difficult to believe that the FBI agents would terminate their
> investigation based on the self-serving exculpatory explanation offered by
> defendant.  If the agents had reason to believe that defendant was a participant in
> MacDonald's political corruption, they would not expect a full confession in the
> context of an unsworn interview.  That the investigation eventually revealed what
> the government claims is the truth about the car is evidence that they did not rely
> exclusively on defendant's statements.  We conclude that defendant's unsworn
> exculpatory statements given in his own office to interviewing FBI agents did not
> have the natural and probable effect of impeding the due administration of justice
> in the sense required by 18 U.S.C. § 1503, and a prosecution under that section is
> therefore barred.

*Id.* at 696-97.  The situation in this case is identical to that in *Wood*, and because Count

Three fails to allege the required nexus, it must be dismissed.

WHEREFORE, Dr. Luthra moves this Court to dismiss the indictments as requested and seeks a

hearing on the matter.

Respectfully submitted,
RITA LUTHRA, M.D.
By her attorney,

/s/ Stephen E. Spelman
Stephen E. Spelman (BBO #632089)
12 Wellington Drive
East Longmeadow, Mass.  01028
(413) 530-4316

Dated:  July 7, 2017            s.e.spelman@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel certifies that the foregoing document, filed through the ECF system, will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF), on this 7th day of July, 2017.

<u>/s/ Stephen E. Spelman</u>